## CABOT v. EASTERN RADIO CO.
### No. 4138.

District Court, D. Massachusetts.
Dec. 11, 1936.

George K. Woodworth, of Boston, Mass., for plaintiff.

Stephen H. Philbin (of Fish, Richardson & Neave), of Boston, Mass., for defendant.

SWEENEY, District Judge.

This is an action in equity in which the petitioner seeks an injunction, and an accounting of profits and damages based on an alleged infringement of the petitioner's patent. The patent involved, No. 1,545,940, was issued on July 14, 1925. This action was commenced on May 24, 1935.

In its answer the respondent charges that the patent is invalid, denies infringement, and sets up defenses of estoppel and laches.

Statements of fact herein are intended as findings of fact, and statements of legal conclusions, as rulings of law, under the equity rules.

Because of the long lapse of time between the issuance of the letters patent to the petitioner, and the bringing of this action, which was approximately ten years later, and because of the common knowledge of the vast strides that have been made in the radio art during that period, it is well to point out the basic differences between the petitioner's set as used at the time of his invention, and the respondent's set. The petitioner's radio was contained in a box about two feet long, eight inches high, and about ten inches deep. On the panels were connections for A and B batteries, a switch, five dials controlling various portions of its inner mechanism, and two additional dials controlling vernier condensers. The electrical energy was obtained from storage batteries. The tubes used within the set were three-electrode tubes, and the set was a regenerative set. Loudspeakers were not in use at that time, if known, and reception was obtained through earphones. In the great strides that have been made in the radio art, storage batteries, earphones, and some of the controls that were necessary to the petitioner's set have been eliminated; loudspeakers are now in common use; and sets to-day are not regenerative. The alleged infringing set is of this latter type. In the petitioner's type of radio, regeneration was needed in order to get the proper amplification. In the respondent's set, amplification is provided without the use of regeneration. The tube used commonly to-day, and, particularly in the respondent's set, is the screen grid type which is designed to prevent the flow back of energy from the output circuit of the tube to the input circuit, and thus prevents regeneration.

The long lapse of time between the issuance of the petitioner's patent and the assertion of his rights where the art involved was making progress by leaps and bounds and was being revolutionized overnight, and during which the business of radio has become one of the important industries of the nation have lulled various manufacturers of radio sets into a sense of security in the use of the arrangement herein complained of. The petitioner licensed various manufacturers to use his invention. It is reasonable to presume that he might readily have ascertained if others were making use of a like arrangement. His failure to discover the use of his invention by others is not satisfactorily explained.

The evidence is clear that since 1925 radio receivers containing the same elements as are here complained of have been advertised and given to the public in more than a million receivers. The failure of the petitioner to assert his claim until ten years after his patent was issued raises the question whether the bill ought not to be dismissed. Reasonable diligence as well as good faith are necessary to call into operation the powers of a court of equity. Woodmanse & Hewitt Mfg. Co. v. Williams (C. C.A.) 68 F. 489.

It is not, however, necessary to decide this case on the question of laches or estoppel for a decision can be predicated on other grounds.

The only claim under consideration in this case is Claim 3 of the patent which reads as follows:

"An electromagnetic-wave receiving-system comprising in combination a parallel-branch circuit having an inductance in one branch and a condenser in the other, a three-electrode vacuum tube having its in-put circuit connected to said parallel-branch circuit, a second parallel-branch circuit having an inductance in one branch and a condenser in the other, means connecting the out-put circuit of said vacuum tube to said second parallel-branch circuit, movable means for mechanically connecting a tuning element of one of said parallel-branch circuits with a tuning element of the other of said parallel-branch circuits, said tuning elements being so constructed and arranged that for any given position of said movable means both parallel-branch circuits are attuned to sub-

stantially the same frequency, and means for slightly varying the natural period of one of said parallel-branch circuits without altering that of the other of said parallel-branch circuits whereby the oscillatory phenomena of said parallel-branch circuits may be controlled independently of the position of said movable means."

The petitioner's invention embodies a regenerative radio receiving set of the 1922 period. The in-coming signals were so feeble that they had to be amplified in order that they might be heard even on the earphones. The type of tube used by the petitioner, if regeneration were not present, would amplify in-coming signals about eight times. This was not sufficient to provide the desired reception. The additional amplification provided by regeneration brought much better results. Regeneration was caused by energy in the output circuit of the tube tending to feed back to the input circuit, and there combining with the in-coming energy to produce the needed amplification. One of the difficulties with regeneration was that it needed control to prevent the set from going into self-oscillation which would be indicated by "squeals" and "birdies" with which everyone who recalls that period of radio reception is familiar. At a point just below where the set went into self-oscillation, there was a floating point, or a point where reception was at its best. To accomplish the control of regeneration in his set, the petitioner devised the arrangement which is set forth in Claim 3. Stripped of its technical language, it means that he arranged in his set to have two parallel-branch circuits, each having an inductance and two condensers. These two branch circuits were connected through the three-electrode vacuum tube. The main condensers of each of the circuits and the inductance of the second circuit were all controlled by a single dial on the outside of the set. The second condensers in each circuit were a small type known as vernier condensers, and were provided as a means for varying the natural period or frequency of one of the circuits without affecting that of the other. This resulted in the receiver getting a finer adjustment and clearer reception. In theory, once the vernier dials were set at their best position, they could be left there while tuning to other stations. But, as a practical matter, and due, in part to the type of accessories that were known then, such as a storage battery with its fluctuating charge, and a general lack of confidence in this new art, it is probably accurate to say that each time the radio was used to tune in on a different station an adjustment was made of either one or both of the small verniers. Without these vernier condensers, as a listener tuned to different stations the amount of regeneration would vary. At some stations there would be very little regeneration, and at others, a great deal. It was to control this regeneration that the small verniers were used. The petitioner's set was operated by A and B batteries, and had no other electrical connection. As the charges in these batteries varied in accordance with the time of their use, and the condition of the batteries themselves, there was a necessity for the adjustment of the vernier condensers in order to bring about the finest reception. The claim of the petitioner is that by means of his invention the oscillatory phenomena of the circuits might be controlled independently of the other, and while regeneration was the type of oscillatory phenomena to be controlled, the petitioner's invention might cover other oscillatory phenomena which would be present. The type of oscillatory phenomena to be controlled in the regenerative set has already been described.

The petitioner's radio was of the regenerative type, and the result which he hoped to accomplish by his invention was the control of regeneration. However, his invention did not limit him to the single use of his invention for this purpose. He is entitled to all the benefits known or unknown that accrue to his invention.

The petitioner does not claim to have been the first to invent any of the various elements used in his invention. The three-electrode tube, inductance, and condensers, including the vernier condensers, were old in the art at that time, but it is rather in the arrangement or seriation of these elements that the petitioner claims invention. He was the first to use the seriation described for the control of oscillatory phenomena, and I therefore rule that the patent as issued was valid. See Proudfit Co. v. Kalamazoo Co. (C.C.A.) 230 F. 120; Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034; Hobbs v. Beach, 180 U.S. 383, 21 S.Ct. 409, 45 L.Ed. 586. I find, however, that the only oscillatory phenomena intended to be controlled was the regeneration of his own set.

The respondent uses tuned circuits in somewhat the same fashion that the peti-

tioner used them. A single dial on his set controls two or more main condensers in parallel-branch circuits. These tuned circuits are equalized by a trimmer condenser. While a trimmer condenser may be likened to a vernier condenser in that it may be used to vary the natural period of a circuit, its use in the respondent's set is not at all similar to the use of the vernier condenser in the petitioner's set. The respondent's set could be built and operated without the vernier or trimmer. Assuming, for the sake of argument, that the trimmer condenser used is the mechanical duplication of the vernier used by the petitioner, nevertheless, its use is not for the same purpose, and is not accomplished in the same way. The trimmer condenser used in the respondent's set is used solely for the purpose of equalizing two circuits. The circuits could have been equalized in manufacture by laborious and precise measurement and adjustment. The trimmer is used only to correct errors produced by mass production of instruments that need precision. It needs but one adjustment after the set has been assembled. This adjustment is usually made by the service man setting up the receiver in the home of its new owner. Once having been adjusted, the trimmer condenser is in such a position that it is not accessible to the operator. It is hidden away in the bowels of the set.

As has been previously pointed out, continuous use of a vernier was necessary to the petitioner's set. By that, I mean that many adjustments had to be made of the dial that controlled that vernier. It was absolutely essential to the operation of the petitioner's set. The regeneration that he needed for amplification had to be controlled to eliminate self-oscillation.

The question of infringement involves considerations of practical utility and of substantial identity, and therefore must be quantitative as well as qualitative. Goodyear Shoe Machinery Co. v. Spaulding (C. C.) 101 F. 990. As far as practical utility is concerned, there is no similarity between the petitioner's and the respondent's arrangement, and I find it lacking in substantial identity.

The combination of the elements used by the respondent is not of the same as that used by the petitioner, and is not used for the same purpose. The respondent's trimmer condenser is used only for the purpose of aligning the respondent's set or correcting inequalities of errors in a series of unitary control. There is no oscillatory phenomena which it attempts to control other than the bringing in of clear reception at its best point. A vernier condenser operated by a dial on the outside of the radio panel differs sufficiently from a trimmer condenser used as above to justify a finding of noninfringement. Then, too, there is lacking in the respondent's set, and hence any necessity for control of it, the very thing that made the petitioner's set one that could be operated, namely, regeneration.

I therefore find and rule that the petitioner's patent rights have not been infringed by the respondent.

The bill is therefore dismissed for noninfringement.