JOHNSON METAL PRODUCTS CO. et al.
v. LUNDELL–ECKBERG MFG. CO.,
Inc.

No. 1747.

District Court, W. D. New York.

Jan. 7, 1937.

E. T. Bean, of Buffalo, N. Y. (H. C. Lord, of Erie, Pa., and W. J. Belknap, of Detroit, Mich., of counsel), for plaintiffs.

D. L. Carlson, of Jamestown, N. Y. (J. William Ellis, of Buffalo, N. Y., and David P. Wolhaupter, of Washington, D. C., of counsel), for defendant.

KNIGHT, District Judge.

This is a suit for infringement of patent No. 1,805,403, issued May 12, 1931, application filed April 26, 1929; patent No. 1,841,187, issued January 12, 1932, application filed December 4, 1928; and patent No. 1,841,247, issued January 12, 1932, application filed June 30, 1928, renewed September 19, 1931. Each of these patents was issued to one Theodore Johnson and by him assigned to the plaintiff Johnson Metal Products Company. The plaintiff Detroit Steel Products Company is a licensee of Johnson Metal Products Company under a license agreement dated October 26, 1928. The defenses are anticipation and lack of invention as to certain

claims, noninfringement as to others, and a plea of nonjoinder of joint inventors.

■ The main issue involves fourteen claims of patent No. 1,805,403. The other patents relate to details of a part of such patent. The typical claims of the fourteen are 29, 18, 26, 28, 21, and 9. Five claims of patent No. 1,841,187 are in issue. Typical claims of these are 10 and 13. Two claims of patent No. 1,841,427 are involved. Of these the typical claim is 1. The claims in suit in patent No. 1,805,403 may be included in two groups. One of such groups relates to alleged improvement in casement window structures without reference to screen (claim 28 includes all of this group), and the other of such groups relates to improvement in such windows combined with the screen at the room side (claim 29 shows the complete combination). In combination, the claims in suit include a metal casement window with outswinging sash, screen mounted on the face of the metal frame closely adjacent to the sash, together with an actuator attached to the metal frame on its lower side and extending through the sight opening also attached to the lower side of the sash, and a lock mounted on the metal frame engaging the free edge of the sash with a handle operable from inside the screen. The handle of the lock and the operator unit of the window are laterally and transversely within the opening in the completed structure and operable without removing the screen, the screen being removable without interfering with the sash or the hardware.

Defendant's structure is a metal casement window with outswinging sash, lock, and actuator mounted on the casement frame with a screen mounted directly on the frame, and a lock and actuator so operable as to open, close, and lock the sash without removing the screen. Defendant's structure concededly is a standardized unitary metal window structure and can be factory fabricated in its entirety.

■ Patent No. 1,841,187 relates to window fastening means, including an operator secured on the sash, support for the operator on the window frame, screen adapted for covering the frame opening and the operator extending through the sash frame and a support attached to the frame to support the actuator, the support being adapted to serve as a mounting for the screen and a screen mounted thereon.

Patent No. 1,841,247 is substantially similar to patent No. 1,841,187, except it includes means on the support for locking the operating element in various positions.

The defendant company does not manufacture screens. It manufactures so-called casement windows equipped for the application of screens, and it has sold its product with screens attached.

The claims of Johnson's patents are directed to "casement windows" and are limited to structures having outswinging sash. This excerpt from the specifications of patent No. 1,805,403 describes its objects:

"The invention also contemplates the provision of a casement window structure embodying a window frame and an associated outswinging sash together with a locking means and an actuator for the sash operable from within a wall opening and without disturbing a screen disposed over the inner face of the frame and closely adjacent to the sash when closed."

Some diversity of view is expressed as to the meaning of "casement." Webster defines it as "a window sash opening on hinges affixed to the upright side of the frame." Whether this indicates an inswinging and outswinging sash is not material here as plaintiffs' patents are limited to casements with outswinging sash. "Casement" includes wooden as well as steel construction. None of the three patents in its entirety is limited to a metal part or assembly. Patent No. 1,841,247, titled Casement Operator, contains no reference to a metal structure. Patent No. 1,841,187, titled Closure Fastener, describes certain claims, including "a closure operating structure comprising an open metallic frame, * * *" and others containing no limitation of material. Patent No. 1,805,403 describes certain claims, including "a casement assembly unit comprising a metal frame," and others containing no limitation of material. The defendant's brief (page 2) states that the claims of patent No. 1,805,403 involved in this suit relate to "an alleged improvement in metal casement window structures," and "an alleged improvement in metal casement windows." Casement windows have become generally referred to in the trade as including metal casements only. In the view taken here, the claims in issue, however, will be considered from the broader meaning above given.

"Casement" windows have been in use for nearly two centuries. Their first introduction into this country was in factory construction. Since then, they have come to be quite generally used in various types of domestic architecture. There have been introduced in the record many catalogues and photographs describing and picturing casement windows as they have been made by manufacturers in the United States from 1912. These catalogues and photographs show outswinging, outswinging and inswinging, horizontally and vertically in and outswinging, and inswinging and outswinging top hung, and projected and counter-balanced sash. The difficulties in completely screening each of these types, save the inswinging sash, are apparent. Outswinging sash are ordinarily the type found in dwellings, while the other types are generally used in manufacturing buildings. Until recent years, as shown by the catalogues, screening of casements in dwellings was an incidental consideration so far as the casement manufacturer was concerned. The method of screening of dwelling casements was left to the individual builder. In later years, the attempt has been made to fabricate the casement for the convenient application of screens. Necessarily in domestic use, casements required screening. The application of a screen through some method naturally followed the introduction of the casement window in dwelling construction.

The advantages of a structure in accord with the plaintiffs' patents are obvious. It permits standardization, so that the screen may be factory fabricated. This measurably decreases cost of screen construction and installation. The structure provides more efficient screen protection. It facilitates the opening and closing of the sash when the window is screened. It obviates interference with interior decorations. These results are undenied.

As anticipating the patents in suit, defendant has made proof of several alleged prior art uses, many publications and catalogues, and numerous prior patents.

### Prior Uses.

Prior uses upon which the defendant mainly places reliance, to which reference need be made herein, are the so-called Wheeler installation (1913); Fenestra Horizontally Pivoted Steel Sash Unit (1917); Pevely Dairy installation (1919); Truscon Flexo Stay (1924); Siegel, Ford, and Pullman installations, prior to 1915. Wheeler (Defendant's Exhibit TT1) shows an outswinging casement window with a push bar seated on the frame and connected with the sash, with a thumb screw to hold the sash in position when opened; a handle on the sash, and a sash lock mounted on the frame. The screen was not mounted on the frame, but was mounted on the trim far enough from the frame to clear the hardware. Fenestra shows a horizontally center pivoted inswinging and outswinging sash. It shows its adaptation to a screen covering one-half of the sash only. It would be impossible in this type of construction to put a fly proof inside screen closely adjacent to the frame over the entire frame opening and operate the sash. There seems to be more or less confusion as regards what the Pevely installation shows. The photograph in evidence shows screened sections of casement windows. It seems to be admitted that they are hinged at the top. Whether they are outswinging only or outswinging and inswinging cannot be determined. A push-bar is shown. It is carried by a support mounted on the frame. There is no lock. The screen was placed closely adjacent to the sash. Truscon Flexo Stay shows an outswinging sash with a so-called "Flexo Stay" or operator and handle attached. The screen is mounted on the frame. The Truscon catalogue describes the stay as operable "without the necessity of removing the screen." It is not described as serving the purpose of a lock as well as operator. The sash is locked by means of a lock on the sash. In this type of construction the window cannot be locked without opening the screen. Siegel shows a vertical outswinging and inswinging sash, pivoted top and bottom, some distance from the side of the frame. Ford shows outswinging and inswinging sash vertically pivoted. Pullman like Siegel shows a window pivoted vertically some distance from the side of the frame. None of the above-mentioned assemblies solve the problem answered by Johnson. None of them show the type of construction to which a screen could be applied closely adjacent to the frame and such that the window could be opened without opening the screen.

The types of screens generally available prior to 1928 were so-called side hinged, sliding and roller screens, and they were generally mounted on the trim and set out a distance from the frame in order

to clear the hardware. There is not a single catalogue or publication in evidence covering the period down to 1928 showing a window frame with a screen closely adjacent thereto, so seated upon the frame as to permit the opening of a side hinged sash without opening some part or portion of the screen. Truscon Steel Company has for many years been a large manufacturer of casement windows. Numerous of its catalogues and publications are in evidence. As late as 1928, its catalogue entitled "Standard Casement and Basement Windows" describes the screens to be used in connection therewith as of "roll" type, "horizontal sliding," and "swing" type, and it recites "casements are screened on the inside (several practical methods) offering advantages in point of cleanliness and protection from the elements." In 1929 Truscon circularized so-called "casement roll up screens" and "casement side hinged screens." In 1931 for the first time, Truscon stated in its catalogue "that all hardware shall be designed to permit the opening and closing and locking of all swing leaves without the removing or opening of screens." Following 1928, other large manufacturers adopted the Johnson method of screening.

### Prior Patents.

Of the numerous patents cited by the defendant as anticipating, all, with the exception of two, may be dismissed with brief references. While they do disclose certain parts or elements comparable with those in plaintiffs' structure, they do not show these in the same combination to accomplish the same result as does Johnson. Gallup patent No. 1,148,375 is a wooden structure directed to a "casement window operator." It reveals an operator fitted on a wood sill and a screen on the trim some distance from the sash. It shows no separate lock. McClarren patent No. 1,-179,640 reveals a "casement window operating device" fitted on a wooden sill and purposed to carry a screen on the rim distant from the sash and frame. Aitchison patent No. 1,262,157 describes a casement window operating device. The material of construction is not specified. Presumably it is of wood. The operating device works through a slot at the bottom of the screen. In the structure described, the screen necessarily must be located distant from the casement sash. It has no means of locking other than the operating device. Keeler patent No. 1,221,186, granted April 3, 1917, shows a wooden structure, with screen set distant from the sash and a locking device operated through holes in the woodwork. Necessarily it requires fabrication on the job because of the locking device and necessarily the screen must be some distance from the sash because of the hardware. Whitney patent No. 1,618,617 shows a "window fastener." It has no actuator. Under Griffin patent No. 1,058,050, lock and the screen must be seated distant from the sash. Fulton patent No. 1,544,387 shows a window lever guide rod extending through a window batten below the screen. It has no lock. No other features require consideration. Worthington patent No. 1,502,132 shows a casement window operator. It has an operating and locking device comparable with Aitchison and McClarren. Fournier patent No. 1,-427,730 claims a window fastener or latch only. No screen or method of application is mentioned. Any screen must be removed to operate the latch. Burk patent No. 1,301,814 shows a latch usable on a transom window like Fournier and others above-mentioned. The screen must be opened in order to move the latch. Ellison patent No. 1,539,549 is a "controller" devised to hold the window in a predetermined manner. This is the single feature of the patent.

These prior patents show various parts which are the equivalents of various parts in the Johnson structure. The rule is well established that a mere aggregation or combination of old elements does not constitute invention. In re Hopkins (Cust. & Pat.App.) 77 F.(2d) 658; In re Conner (Cust. & Pat.App.) 67 F.(2d) 917; In re Hueber (Cust. & Pat.App.) 70 F.(2d) 906. If, however, such old elements are so combined as to effect a new and useful result and the combination as made is essential to such result, that amounts to invention. The purpose here is to provide a more efficient, economical, and practical screened casement window. "The notion that the parts of an invention must co-operate is certainly very persisting in the patent law, and it must correspond to some underlying idea. * * * The co-operation of the means necessary to create an invention is to be measured by the purpose to be fulfilled, not by the interaction of the parts. Each factor must indeed be a condition to that result, but the whole may be a mere assemblage; the co-operation between them all may be no more than their necessary presence in a unit which shall answer a single purpose."

Sachs v. Hartford Electric Supply Co. (C. C.A.) 47 F.(2d) 743, 748. The rule of determination here is again well put in the opinion in B. G. Corporation v. Kidde & Co., Inc. (C.C.A.) 79 F.(2d) 20, 22, where it is said:

"All machines are made up of the same elements; * * * all acting their parts as they always do and always must. All compositions are made of the same substances, retaining their fixed chemical properties. But the elements are capable of an infinity of permutations, and the selection of that group which proves serviceable to a given need may require a high degree of originality. It is that act of selection which is the invention."

And Kurtz v. Belle Hat Lining Co. (C. C.A.) 280 F. 277, 282, where it is said: "Patentability has often been found 'in discovering what is the difficulty with an existing structure' and correcting the same, even though 'the means' are old and their mere 'adaptation to the new purposes involves no patentable novelty.' "

See, also, Simplex Piston Ring Co. of America v. Horton-Gallo-Creamer Co. (C. C.A.) 61 F.(2d) 748; and Westco-Chippewa Pump Co. v. Delaware Electric & S. Co. (D.C.) 57 F.(2d) 559.

█ As stated by the defendant, Johnson did enter the field of a crowded art. The fact that this crowded field did not discover a type of structure such as was Johnson's until years after manufacturers had been working in the field of screened casement windows is strong evidence in and of itself of invention. Johnson's structure was more than a mere aggregation.

█ The great commercial success the Johnson type of screened metal casement has had is also evidence of invention. Paramount Corporation v. Tri-Ergon Corporation, 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997:

"Where the method or device satisfies an old and recognized want, invention is to be inferred, rather than the exercise of mechanical skill." * * *

Stanley Works v. Twisted Wire & Steel Co. (C.C.A.) 256 F. 98, 101: "The placing of this invention upon the market has resulted in an unusual commercial success, which is now frequently considered as evidence of invention."

"The annual sales of this patented product grew from 22,373,700 feet in 1913, to 100,281,800 feet in 1917. This speaks with great force for its novelty and utility. * * * This phenomenal success, with the advantages given to merchants, and manufacturers who require a metal strapping in their business, leaves no doubt in our mind that invention is clearly shown."

█ Forchheimer v. Franc et al. (C. C.A.) 20 F.(2d) 553; Franc-Strohmenger & Cowan v. Arthur Siegman, Inc. (C.C. A.) 27 F.(2d) 785. The old types were largely abandoned by manufacturers, and the new type supplanted them. The record discloses that in 1933 the Johnson Company's output of screens approximated 30 percentum of the screens sold by twenty of the principal manufacturers. While the structural improvements made by Johnson may be simple, this alone does not argue against patentability. Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S. Ct. 652, 53 L.Ed. 1034; H. C. White Co. v. Morton E. Converse & Son Co. (C.C. A.) 20 F.(2d) 311. The simplicity was not discovered by manufacturers of casement window screens after years of research. "Its simplicity, in view of the failure of prior inventors to attain the very desirable result achieved by the patentees, is the very basis on which invention may be found." General Electric Co. v. United States Electric Mfg. Co. (C.C.A.) 63 F. (2d) 764. No specific formula tells us what invention is. It is measured by the advance shown in the art with which it is concerned. This measure includes novelty and utility. The mass of evidence in this suit shows that Johnson's form of structure is novel and useful and shows a decided advance in the art of screening outswinging metal casement windows.

It is necessary to consider the claims in suit separately.

Claims 1, 2, 19, 21, 23, and 28 of patent No. 1,805,403 relate to the window structure alone. Claims 9, 18, 24, 25, 26, 27, 29, and 30 relate to the window and screen combined.

It is unnecessary to determine the validity of claims 19 and 23 of the first group. The claims provide that the location of the mounting for the lock shall be "within the sight opening defined by the outer members of the frame." Defendant does not infringe these claims as no such mounting is disclosed in the structures it manufactures or sells. The same conclusion, based upon the same reason is reached in regard to claim 26 which in-

cludes a screen mounted on the frame. Even though defendant made a structure comprising a double window with the lock mounted on the dividing bar between the windows, it would not infringe this claim, because, as hereinafter stated in regard to claim 2, the dividing bar constitutes a part of the frame. The bar is not made a part of the structure merely for the purpose of serving as a mounting for the lock. The bar being part of the frame, the lock mounted thereon is not within the sight line of the frame.

In the court's view, claims 1, 2, 9, 18, 21, 24, 25, and 28 of patent No. 1,805,403 are not patentable over the prior art. All of the elements of claim 1 are shown in the Wheeler installation and are found illustrated in a catalogue of the Truscon Steel Company titled "Hardware for United Steel Casements," plate 215, copyrighted 1914. Claim 2 shows a double window (each like claim 1) with the lock on the dividing bar. This bar is nothing more than part of the frame. What has been said about claim 1 is applicable to claim 2.

Claim 21 differs from claim 1 in that it recites that the lock is "mounted on the frame and directly engaging an immediately adjacent part of the free edge of the sash." The prior art heretofore shown as anticipating claim 1 also anticipates this claim. Claim 28 shows a frame and sash, actuator and lock mounted on the frame. It contains no reference to a screen. The Wheeler installation discloses all the elements of this claim.

Claim 9 relates to the window assembly including frame, outswinging sash, means for securing the sash from inside the frame, screen and devices on the frame "acting on the screen frame as a fulcrum securing the edge of the frame and positioning the screen with relation to the frame and means as it is swung to place." The claim describes the outswinging sash as being "in combination with means positioned transversely and laterally within the opening for securing the sash from inside the frame." While the interpretation of the word "means" in this claim is somewhat obscure, it seems to the court that it may be construed as meaning the "locking unit." If this interpretation is correct, no invention is disclosed, since the claim shows only a screen mounted on the face and over the opening of the frame, with no means of opening and closing the sash without opening the screen. The mere positioning of the screen on the frame over the opening does not disclose any utility or novelty. There is no disclosure of any actuator or other means of opening and closing the sash without opening the screen.

Claim 18 relates to a casement, on the frame of which is mounted a sash lock with a screen closely adjacent to the sash when closed. It includes no operator. The only difference between this claim and claim 9 is the provision that the screen be "closely adjacent to the sash when closed. * * *" Claim 24 likewise discloses no actuator or means of opening and closing the sash. Claim 25 seems to add nothing to claim 24. For the reasons stated with reference to claim 9, claims 18 and 24 and 25 disclose no invention. Claim 27 is not limited to a casement or side hinged window. It covers a window assembly and actuator with screen seated on the frame, the actuator being operable without opening the screen. The Pevely installation is therefore a complete anticipation of this claim. This claim does not include a lock nor means on the actuator to lock the sash in various positions of adjustment or in the closed position. Thus even though the claim were read as covering a side hinged window, it would fail to disclose invention. It lacks utility, since the sash is freeswinging at all times. Furthermore, the Pevely installation although top hinged would be regarded as an equivalent of the structure claimed, since by merely turning it from a vertical to a horizontal position it would exhibit every feature of the claim. The same reasoning applies to claim 30, the only difference between the two claims being that the latter more particularly describes the location of the actuator bar when the sash is closed.

Claim 29, which comprises a frame, sash, lock, and actuator adapted to form a standardized fabricated metal unit insertible in a window opening, the lock and actuator being operable from within the room and without opening a screen mounted on the room face of the frame closely adjacent to the sash when closed, describes a structure which, on the basis of the prior art as heretofore set forth, is both new and useful and must be held valid. The unit composed of metal frame, sash, lock, and actuator is old in the art. The placing of a screen over the face of

a frame not equipped with inside operable lock and actuator is an old expedient. The combination of all the parts of the patent, however, produces a structure previously unknown to the art which has the advantage over prior construction that in a structure having a metal frame, a screen is mounted on the room face of the frame closely adjacent to the sash when closed, the lock and actuator being operable without opening the screen. This allows for the unlocking and locking, and opening and closing of the sash without disturbing the screen whereas formerly, in structures having a metal frame, the screen was not mounted on the frame, and it was necessary to open the screen in order to perform at least one of the operations above noted, thus permitting the ingress of insects to the room and detracting from the efficiency of the screen. The patent structure also provides greater convenience in the operation of the sash than any combination having a metal frame found in the prior art or prior patents, because of the fact that it is unnecessary to move or touch the screen in any manner whatever in order to operate the sash. A further advantage is that mounting the screen on the metal frame enables the manufacturer to stock screens in standard sizes and does away with the difficulties of measuring the window opening and making a screen to such measurement as was required under the old system of mounting the screen on the trim. The claim does not include factory fabrication of the screen mounting devices as a part of the unitary structure.

Claims 9, 10, 11, 12, and 13 of patent No. 1,841,187, collectively, relate to a frame, a moveable closure co-operatively engaging the frame, a support secured to the frame, an operating element actuating the movable closure carried by the support, and such support serving as a mounting for the screen. Claims 9, 11, and 12 are not limited to a "metallic frame"; 10 and 13 are. Nothing is said about construction as a factory fabricated unit. There was nothing new or novel in the operator in the position described. Numerous disclosures in the prior art and patent show a so-called operator having the supporting element seated either on a steel frame or on a wooden sill. The catalogues "Hardware for United Steel Sash" (1914 and 1916) and Truscon catalogue (1924) show actuators mounted on a metal frame. The Wheeler installation shows such a structure. The Pevely and Siegel installations may be cited in this connection, since the claim is not limited to side-hinged structures. These are all steel casement windows. Among others, Griffin, also, shows an equivalent structure. None of these structures disclose the screen mounted on the support as described in claims 12 and 13. Such use of the support as a mounting for the screen is an advantage if it reduces the additional means which must be mounted on the frame in order to support the screen. The improvement is patentable. Defendant's screen is held against the frame by clips and does not require the support of the actuator element when attached to the frame. However it is the finding of the court that when used in the normal, easiest, and most efficient way, defendant's screen will be rested upon and derive support from the actuator housing. This constitutes infringement. Walker on Patents (6th Ed.) § 424.

Claims 9, 10, and 11 are invalid over the prior art. Any novelty in these claims lies in the support "being adapted to serve as a mounting for the screen." Plaintiffs' support is particularly designed not only to bear the weight of the screen, but also to secure the lower part of the screen against the frame. Defendant's structure shows no such design. If these claims are to be construed to read on defendant's device, they will be found broad enough to cover almost any actuator support which is mounted on the lower part of the frame. Thus it would be found that since the support in the Wheeler installation could be used as a mounting point for a screen it would read within the claim. The same is true of the Flexo-stay structure and the Pullman and Siegel installations. Since a structure, which would infringe if later than the patent, anticipates if earlier, claims 9, 10, and 11 must be held invalid over the prior art.

Claims in issue in patent No. 1,841,247, 1 and 2, contain the elements of claims 9, 10, and 11 of patent No. 1,841,187 hereinbefore described plus "means directly mounted on this support for locking the operating element in various positions of adjustment." To conclude that these claims are invalid over the prior art, it is only necessary to refer to the discussion in regard to claims 9, 10, and 11 of patent No. 1,841,187 and point out that there are many devices illustrated in the prior art having means mounted on the actuator support for locking the actuator in various

positions of adjustment. Specific reference may again be had to the Wheeler structure referred to in regard to patent No. 1,841,187. That actuator support had a thumb screw mounted thereon, which could be turned down to lock the actuator at any point of its movement.

Defendant's structure is equivalent in all respects with the structure described in claim 29. It discloses a casement window comprising a skeleton metal frame, an outswinging sash on the frame, a frame forming a stop for the sash, a window lock mounted on the frame and directly engaging an immediately adjacent part of the free edge of the sash, the lock having a handle and there being an actuator secured to the sash and mounted on the frame. The frame, sash, lock, and actuator are adapted to form a standardized fabricated self-contained metal unit insertible into a window opening with a lock and actuator operable from inside the window. The screen has a frame insertible into and from the inside of a wall opening and mounted on the room face of the frame, said lock and actuator being operable without opening the screen.

Two patents cited as anticipating require more detailed consideration. One is Griffin No. 1,050,850, issued April 8, 1913, and Carswell No. 1,744,158, application filed July 9, 1927, patent issued January 2, 1930. The testimony of the expert for defendant is in effect that these two are the only patents produced by the defendant which embody the element of plaintiffs' patents and serve their purposes.

Griffin is a wood structure of the thickness of the wall. It shows an actuator, lock, screen, and an outswinging sash moveable from the room side without disturbing the screen. The screen is seated on a batten on the sill and held distant from the window about one inch by a shoulder on the inside of the jams. This shoulder also acts as a stop for the sash. The location of the screen with respect to the sash is made necessary in order to clear part of the hardware of the lock and actuator. The actuator is seated on the sill which is part of the frame, extends through the batten and is attached to the lower inside edge of the sash. The mechanism housing the actuator on the sill is partly inside and partly outside of the batten. When closed, the arm of the actuator is between the screen frame and the sash. The lock is mounted on the frame. The handle is on the room side of the casing and the room space. It operates to lock and unlock the window by a mechanism extending into the frame by a connection with a latch arm which is raised or lowered in a catch plate on the inside of the sash. The entire hardware of this catch plate is between the sash and the screen frame. It is fundamental that mere substitution of materials does not in itself show invention. United Shoe Mach. Corp. v. E. H. Ferree Co. (D.C.) 60 F.(2d) 567. Nor is it invention to merely substitute superior for inferior materials. Walker on Patents, Vol. 1 (16th Ed.) par. 6, p. 78. Defendant cites numerous cases among the long line of cases apropos of this rule. It is manifest that comparison of the facts in a case must be made to determine the applicability of the rule. Such examination here leads the court to conclude that none are controlling here. There is no mere substitution of materials. The Griffin patent is not suited for use in a steel casement window. Its existence for upwards of fifteen years did not suggest to manufacturers a use in the method and form shown by Johnson. Screening of slender steel casement windows presents a problem quite different from screening the common wood sash in a wood frame. As shown by the history of the art, in this record of publications and patents, the fundamental inventive idea in Johnson is the use of lock and actuator on a thin steel body. Exceptions to the rule relative to the substitution of materials are found in the statement in Walker, supra, p. 79, as follows: "And substitution of materials may constitute invention, where it * * * results in * * * the first practical success in the art in which the substitution is made, or increased efficiency or in a decided saving in cost of operation." "If such a substitution involves a new mode of construction, or develops new uses and properties of the article formed, it may amount to invention." Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 496, 23 L.Ed. 952; Berry v. Robertson (D.C.) 40 F.(2d) 915; George Frost Co. et al. v. Samstag (C.C.A.) 180 F. 739; Rosenberg v. John Hassall (C.C.A.) 73 F. (2d) 58; Acme Card System Co. v. Remington-Rand Business Service, Inc. (D.C.) 3 F.Supp. 254; Van Heusen Products, Inc., v. Earl & Wilson (D.C.) 300 F. 922. Further, any rule of substitution is inapplicable here. The structures are different. It is not factory fabricated, nor is it prac-

tical to make it such. The screens are not similarly placed. The location of the screen as in Griffin is found in other of the alleged prior art patents hereinbefore described. The actuator is located differently. The lock operator and the operation of the lock are wholly dissimilar. The lock catch on Griffin could not be used on Johnson. The actuator handle employed on Griffin could not be operated on Johnson. Such are the essential differences between the two devices that one needs go no further into the question of the substitution of materials. Griffin accordingly was not an anticipation of plaintiffs' patent No. 1,805,403.

As to the Carswell patent, two questions are raised. One concerns procedure in the Patent Office; the other relates to priority of invention.

Plaintiffs claim that the so-called Johnson actuator was made prior to May 2, 1926; that a drawing in evidence purporting to show two locks and a screen substantially such as described in the patent No. 1,803,403 was made by Theodore Johnson on or shortly prior to May 2, 1926; that within a few weeks following such date the actuator and one of the locks outlined in the drawing and a screen were mounted on the frame of the window set in the form of a casing; that in or about September, 1926, a second assembly of lock, actuator, screen, and frame substantially the same as described in patent No. 1,805,403 was put together; that during the winter of 1926-1927 a third assembly showing the aforesaid equipment applied to a double window with dividing bar in the center and lock adapted to lock both sashes was made; and later and in or about the fall of 1927 or early in 1928 a further assembly of these parts was made. The type of the lock and actuator was changed in making certain of these assemblies, but the originals and changes such as made were within the claims and specifications of the aforesaid patent. These contentions are made to antedate the Carswell patent. To support these contentions we have mainly the testimony of Theodore Johnson, Robert O. Johnson, Robert Van Cleve, and Edward Selden. In addition, the plaintiffs have offered in evidence the aforesaid drawing bearing date May 2, 1926, and purporting to have been made on or about that time and purporting to be witnessed by Paul G. Johnson and H. S. Wittmack and also certain of the original parts claimed by plaintiffs to have entered into certain of these assemblies. In denial of plaintiffs' claim that Johnson antedated Carswell, defendant offered the testimony of Paul G. Johnson and Edward Johnson relative to the dates of these various assemblies, and testimony of Julius Kahn in denial of the use of certain parts of these assemblies when claimed to have been used.

The degree of proof required to prove that Johnson's invention antedated Carswell is clear. No better statement of this can be found than that made in the case of United Shoe Mach. Corp. v. Brooklyn Wood Heel Corp. (C.C.A.) 77 F.(2d) 263, 264, in the language of Judge Hand, which is as follows:

"When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so."

There are numerous other cases to like effect which might be cited. It is the court's opinion that the plaintiffs have met the burden fixed by this rule.

The Johnsons as referred to herein are composed of three brothers and one brother-in-law. For upwards of ten years, they have been engaged in the manufacture of screens for casement windows. For some years preceding 1932, the brothers were engaged together in this business under the name of Johnson Metal Products Company either as members or employees. Theodore Johnson seems to have been the leading member of this company. Paul Johnson left the company in 1932 and organized a new screen company of which he is president, under the name of Johnson, Inc. Edward G. Johnson left it in 1934; Theodore Johnson and Robert O. Johnson have continued with it since that time. Edward G. Johnson became connected with Johnson, Inc., shortly prior to his testifying herein. Johnson, Inc., is a company competing with Johnson Metal Products Company. A very considerable part of a long record is consumed in the testimony relative to the date of the two alleged inventions. It is not possible to give any adequate picture of the record in respect to these. The court can call attention only to the major considerations which influence its decision. As stated, in 1930, Theodore Johnson swore back of the Carswell

application, as provided and authorized by rule 75 of the Patent Office. In his own affidavit then made he goes into great detail to show the order of the assemblies of his patent. Corroboration of his proof on this trial cannot be based upon this affidavit or the other affidavits used in the same connection. However, the court may take into consideration the affidavit in connection with any attempts at contradiction. The only material alleged contradiction is claimed to be found in the testimony with reference to a lock (Exhibit B in evidence) referred to by Theodore Johnson in his affidavit as one variation made by him. It is not claimed by Theodore Johnson that this lock was made by him. Exhibit B shows the screen with a removable part to give access to the hardware. However, when the statements in the affidavit with respect to these assemblies is carefully read, it will be clearly seen that the reference to Exhibit B was an error and that what Johnson intended to refer to was another lock described in the evidence as Exhibit D. Exhibit D shows a mounting on the frame. Construction of certain other language in the affidavit is alleged to be contradictory to the testimony of Johnson on the trial. In this connection, we refer particularly to the description of the first assembly. This description, as I read it, is that the screen, window, and frame were of later construction than the actuator, and not later construction than the photographs included in the Patent Office affidavits, as defendant claims.

Theodore Johnson gave a consistent history of the development of his patent. He was corroborated in all essential particulars by his brother Robert O. Johnson, Van Cleve, and by Selden. The testimony of the plaintiffs' witnesses with reference to the date of the Johnson invention is attempted to be met by the testimony of Paul Johnson, Edward Johnson, and Mr. Kahn. Kahn is a competitor of plaintiffs. His testimony is directed to show why these assemblies could not have been made as described by the plaintiffs' witnesses. In this respect the attempt fails in all material matters. Paul Johnson and Edward Johnson both testified that the first efforts directed to the invention were made after November, 1926, and that the first assemblies were not made until the latter part of 1927. They have given considerable testimony to support their reasons for fixing this date. This testimony is in direct contradiction to that given on behalf of the plaintiff. Paul Johnson witnessed the drawing of May 2, 1926, as of that date. He made an affidavit under date of July 15, 1930, in which he swore that he had read the Johnson affidavit and that the same was true and the aforesaid drawing was made on or before May 2, 1926. On the trial he testified that he did not sign the drawing before the fall of 1926. In the light of these circumstances, his testimony seems little worthy of credence. He does testify that plaintiffs' actuator in evidence, Exhibit 39, was built in late 1926, and that from that time on the brothers were working on the devices. According to Paul Johnson, the first assembly of lock, actuator, and screen was made after the filing of the application in 1928. Paul Johnson's relations with Theodore Johnson in 1930 were pleasant. Now they are unpleasant and hostile. Edward O. Johnson did not go to work for Johnson Metal Products, Inc., until the fall of 1926, and he states that nothing was done on this work during the winter of 1926-1927. This is a denial of the testimony of Paul Johnson with respect to the winter of 1926-1927. Edward Johnson seems to occupy a peculiar relation in respect to this case. During the earlier hearings on the trial, he was expected to be called as a witness by the plaintiffs; he had been in frequent consultation with them, and apparently assisted in the preparation of the plaintiffs' case. He was then employed by Johnson Metal Products Company. After considerable delay in the trial and when employed by defendant, he was called as a witness for the defendant. He testified that at some of the conferences with the plaintiffs' representative he was told by counsel or by Van Cleve to forget dates. This is not denied in the record. The significance of this testimony of Edward Johnson is weakened by the admission on his part that he apparently had the confidence of the plaintiffs in the earlier part of the trial, and when asked whether he thought he would have been called by the plaintiffs as a witness if he had told them the story he told upon the stand, he replied: "I probably would have through necessity of holding my position"; and to the question as to whether he thought he would tell something different, hoping to hold his job, he replied: "I am telling the truth right now."

When this suit was tried, approximately nine years had elapsed since the filing of the Carswell application. It is not made

to appear that anything has ever been done by Carswell in connection with his device save the filing of his application and the prosecution of it to a patent.

As heretofore indicated, the conclusion is reached that Johnson reduced to practice and completed his invention prior to Carswell. During the course of the trial, defendant amended its answer to raise the question that the patents in suit were not the sole inventions of the patentee Theodore Johnson, but were the joint invention of Theodore Johnson and Paul George Johnson. There can be no question that the rule is as stated in Larson v. Crowther (C.C.A.) 26 F.(2d) 780, 789, certiorari denied 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560: "Where the novelty of the invention is in fact the joint production of two parties, brought about by the united efforts of both, one of the parties should not be awarded a sole patent." The weight of the evidence here, as the court views it, is that Theodore Johnson was the sole inventor. It does appear that Paul Johnson and others did some work in connection with the making of the assemblies and in assisting Theodore Johnson in his work. "It is frequently difficult * * * to determine whether there was participation by other people in what is claimed as invention, or whether the inventor has received ideas from his workmen * * * and has arrived at the result without independent invention on their part. Frequently this question must be determined by the acts of the parties." Cline v. Horton (D.C.) 274 F. 728, 730. It is apparent that the main idea and the principal part of the work was done by Theodore Johnson. It was well said in Novelty Glass Mfg. Co. v. Brookfield (C.C.A.) 170 F. 946, 954: "But the main idea evidently was that of Kribs, and it is this, rather than the minor features attributable to others, that controls." Certain outstanding testimony undenied goes to show that Theodore Johnson was the sole inventor. The applications were made by Theodore Johnson with the knowledge of Paul Johnson. Both were then officers of the Johnson Metal Products Company. Theodore Johnson made the affidavit dated July 15, 1930, setting forth facts purporting to show that he was the sole inventor. On the same day Paul G. Johnson made an affidavit that the facts stated in the prior affidavit were true. No claim, so far as the record shows, was made at any time prior to this suit that Paul Johnson was one of the inventors. Paul Johnson signed as witness to Exhibit 36, the diagram of the locks and sash purported to have been made by Theodore Johnson. The testimony as a whole of Paul Johnson, Robert Johnson, and Edward Johnson goes to show Theodore Johnson was the inventor. This is further corroborated in the testimony of Van Cleve. Theodore Johnson several times in his testimony used the word "we" in referring to certain work on the devices. It seems to be uncontested that Theodore Johnson was such inventor until the testimony in this connection was given by Theodore Johnson. It is the court's conclusion that Theodore Johnson was the sole inventor.

The court concludes that claims 1, 2, 9, 18, 21, 24, 25, and 28 of patent No. 1,805,403 are not patentable over the prior art; claims 19, 23, and 26 are not infringed; claims 27 and 30 are anticipated in the prior art, but even though they were not anticipated would be invalid for failure to disclose invention; claim 29 is valid and infringed.

Claims 9, 10, and 11 of patent No. 1,841,187 are invalid over the prior art. Claims 12 and 13 are valid and infringed.

Claims 1 and 2 of patent No. 1,841,247 are invalid over the prior art.

Findings of fact and conclusions of law may be submitted and when submitted and signed shall be construed for and as a part of this decision in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.